

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-16-00067-CR

MICHAEL ALAN HODGES, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 54th District Court
McLennan County, Texas
Trial Court No. 2014-1486-C2

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

A jury convicted Michael Alan Hodges of two counts of aggravated assault with a deadly weapon, found true the State's two enhancement allegations, and sentenced Hodges to twenty-five years' imprisonment on each count. On appeal,[1] Hodges argues that the trial court erred in failing to properly instruct the jury on the issue of self-defense against multiple assailants. We find that Hodges was not egregiously harmed by the omission of a multiple-assailant instruction. Accordingly, we affirm the trial court's judgment.

## I. Factual Background

### A. Testimony from the Victims

The State alleged that Hodges assaulted Mark Cashaw and Anthony Scott with a knife. At trial, the jury heard testimony from Cashaw, who was the manager of the Lacy Lakeview apartments where Hodges resided and where the assaults occurred. Cashaw testified that he and Scott encountered Hodges in the parking lot of the apartment complex during their walk back from a nearby convenience store. According to Cashaw, Scott approached Hodges and the two began arguing "face to face, like two pit bulldogs."[2]

Cashaw testified that he saw a knife in Hodges' hands and attempted to break up the argument. He told the jury that he wedged in between Scott and Hodges, with his back towards

---

[1]Originally appealed to the Tenth Court of Appeals in Waco, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Tenth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

[2]Cashaw testified that Scott was holding a beer bottle he had just purchased at the convenience store, but that it was still in the bag and was not being brandished by Scott as a weapon. Cashaw also stated that he did not have a chance to consume any of the beer.

Hodges, and said to them, "[I]t's not worth it." Immediately after this statement, Cashaw "felt some burns, like a heat." The undisputed evidence at trial demonstrated that Hodges stabbed Cashaw on the back of his neck. Cashaw testified that he exited the fray, looked back, and saw Hodges advancing toward Scott while swinging a knife in each hand. According to Cashaw, Scott was "just trying to dodge [the knives] with his hand" and was being wounded in the process.

Scott informed the jury that his disagreements with Hodges began when he met Hodges a few days before the incident, at which point Hodges called out to him and taunted him as he walked by.[3] According to Scott, one day before the incident, Hodges again called out to him as he passed by, prompting Scott to tell Hodges to mind his tongue. Scott testified that when he was walking with Cashaw on their way back from the convenience store on the date of the incident, he saw Hodges and yelled, "Do you have a problem with me?" Scott claimed that he walked away after Hodges failed to reply, but that Hodges stabbed him and hit him in the temple. Scott testified that he turned to face Hodges, saw that he was swinging a knife towards him, and called out to Cashaw, who was "talking to some ladies," for help.[4] Scott said that Cashaw tried to break up the altercation and that he ran away when he witnessed Hodges stab Cashaw on the back of his neck.

Scott sustained knife wounds to his hands, chest, and chin. Cashaw testified that his neck wound required seven or eight stiches.

---

[3]After the incident, but before trial, Scott was convicted of felony offenses. He testified in jail-house clothing during the trial.

[4]Scott said that Hodges may have had two knives, but was not sure of that fact since he was focused on his injuries.

## B. Testimony from the Responding Police Officer

The jury next heard from Joseph Melendez, a former officer of the Lacy Lakeview Police Department who was dispatched to Hodges' apartment and who placed Hodges under arrest after witnessing Cashaw's injury. Melendez' investigation led him to believe that "two individuals were walking past [Hodges'] apartment, some words [were] exchanged, and then a physical altercation ensued." Hodges admitted to Melendez that he used a knife during the altercation, but claimed that "he felt threatened and he cut one guy pretty bad and he stabbed the other one" in self-defense. According to Melendez, Hodges claimed that he had gotten into an argument with Scott on the day before the incident "over a child." After hearing Hodges' explanation of how the altercation occurred, Melendez formed the opinion and testified that Hodges' actions were not in self-defense. Melendez further testified that he saw no injuries on Hodges.

## C. Evidence of Self-Defense

To support his position that he acted out of self-defense, Hodges called Melanie Williams Loyd, who lived in an apartment close to Hodges, to testify. Loyd told the jury that she witnessed five men walking from the convenience store to Hodges' apartment, and described the altercation, as follows:

> One guy continues to walk and the other four stopped. At that time[,] I did not see Mr. Hodges. I just see the one -- one guy run to my apartment door and take off running that way and kick in the air, and that's when I saw Mr. Hodges get up off the ground.

Loyd clarified that she did not actually witness the kick make contact with Hodges, but assumed that it had since Hodges was on the ground after the kick. Loyd testified that Cashaw was among the group of men, but could not identify any of the other men or provide a description. During

4

cross-examination, the State established that Loyd had already seen blood on the ground before she witnessed someone kick in the air, meaning that someone had already been cut by Hodges before she had witnessed a "kick in the air."

Hodges also testified in his own defense. He began by explaining that he saw Scott two days before the incident partying with others, using foul language, and "taking his fist and taking [a] kid's head and going like this."[5] According to Hodges, Scott walked toward him "singing some type of rap song" after he caught Hodges looking at him. Hodges testified that Scott came within fifteen or twenty feet of him before he told Scott, "Don't come at me like that. I'm not that three-year-old child." According to Hodges, a "girl ran up and grabbed [Scott] by the arm and he went off mumbling."

As for the incident, Hodges testified that four men walked toward him, that one of them made a comment, and that Scott, Cashaw, and another man approached him while the fourth man stood back. According to Hodges, Scott asked, "[W]hat's this shit about the other night," and threw a punch at him before he had a chance to reply. Hodges said that Cashaw came towards him while Scott attempted another swing, at which point Hodges grabbed a knife and "slashed," cutting Scott.[6] Hodges testified that he tried to run after using the knife, but was kicked by Scott. He told the jury that Cashaw had a knife in his hand at that point, but that he was able to stab Cashaw before he could use it. Hodges introduced photographs taken sixteen hours after the fight, which he testified showed bruising he had sustained in the fight.

---

[5]The reporter's record does not clarify the movement discussed by Hodges.

[6]Hodges said he only had one knife.

The evidence at trial established that (a) Cashaw was fifty-seven years old, six feet tall, and weighed 250 pounds; (b) Scott was fifty-four years old, five feet, nine inches tall, and weighed 215 pounds; and (c) Hodges was sixty-three years old, five feet, eight inches tall, and weighed 186 pounds. Hodges testified that he was in fear of his personal safety when Scott attacked him and reiterated that he tried to retreat before he was kicked.

## D.    The Jury Rejects Self-Defense

Yet, the jury ultimately rejected self-defense. Cashaw had testified that only he and Scott were involved in the altercation. Melendez also testified that Hodges said only two men were involved in the altercation with him and that neither was carrying any weapon. During cross-examination, Melendez indicated that at the time of Melendez' initial interview, Hodges had claimed that there were only two people fighting against him and that Hodges had not told him that anyone had kicked him. Scott denied having kicked at Hodges. The jury also heard that Hodges had previous convictions for (a) shooting with intent to kill, (b) "feloniously pointing a firearm," and (c) domestic violence and that after this incident, was subsequently arrested for assaulting another person who lived at the apartment complex.

The trial court's charge to the jury included the following self-defense instructions, which are at issue in Hodges' sole point of error:

> Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree that the actor reasonably believes the force is immediately necessary to protect oneself against the other person's use or attempted use of unlawful force.
>
> A person is justified in using deadly force against another if the actor would be justified in using force against the other in the first place, as above set out, and when the actor reasonably believes that such deadly force is immediately necessary

6

to protect oneself against the other person's use or attempted use of unlawful deadly force.

"Reasonable belief" means a belief that would be held by an ordinary and prudent person in the same circumstances as Defendant.

"Deadly force" means force that is intended or known by the persons using it to cause, or in the manner of its use or intended use is capable of causing death or serious bodily injury.

A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force. You are not to consider whether the actor failed to retreat.

When a person is attacked with unlawful deadly force, or he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack. It is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

In determining the existence of real or apparent danger, you should consider all the facts and circumstances in evidence before you, all relevant facts and circumstances surrounding the offenses, if any, the previous relationship existing between the Defendant and any other person together with all relevant facts and circumstances going to show the condition of the mind of the Defendant at the time of the offenses, if any, and, in considering such circumstances, you should place yourselves in the Defendant's position at that time and view them from his standpoint alone.

7

In its application paragraph, the trial court instructed the jury as follows:

COUNT I

Now, if you find from the evidence beyond a reasonable doubt that on or about the 26th day of August, 2013, in McLennan County, Texas, the Defendant, Michael Alan Hodges, did then and there intentionally or knowingly cause bodily injury to Anthony Scott by cutting the said Anthony Scott with a knife, and the Defendant did then and there use or exhibit a deadly weapon, to-wit: a knife, during the commission of said assault, but you further find from the evidence, or you have a reasonable doubt thereof, that at that time the Defendant was under attack or attempted attack from the complainant, Anthony Scott, and that the Defendant reasonably believed, as viewed from his standpoint, that such deadly force as he used, if any, was immediately necessary to protect himself against such attack or attempted attack, and so believing, he caused bodily injury to Anthony Scott by cutting the said Anthony Scott with a knife, during the commission of said assault, then you will acquit the Defendant and say by your verdict "not guilty."

If you find from the evidence beyond a reasonable doubt that at the time and place in question the Defendant did not reasonably believe that he was in danger of death or serious bodily injury, or that a reasonable person in Defendant's situation at the time and place in question would have retreated before using deadly force against Anthony Scott, or that Defendant, under the circumstances as viewed by him from his standpoint at the time, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against Anthony Scott's use or attempted use of unlawful deadly force, then you should find against the Defendant on the issue of self-defense.

Similar instructions were given on the second charge of assault against Cashaw. The jury rejected self-defense and convicted Hodges of both counts of aggravated assault.

## II. Omission of the Multiple-Assailant Instruction Was Not Egregiously Harmful

Hodges challenges his convictions on the ground that the jury was not provided with a multiple-assailant instruction and that the trial court's self-defense instructions were "too restrictive." Hodges explains that he "was entitled to a charge that he had the right to defend himself against a hostile demonstration or threatened attack by Scott and Cashaw or either of them

8

or by multiple assailants known or unknown in each count of the indictment." Hodges did not make a request at trial for this multiple-assailant instruction.

### A.    Standard of Review

"A claim of jury-charge error is reviewed using the procedure set out in *Almanza*." *Riggs v. State*, 482 S.W.3d 270, 273 (Tex. App.—Waco 2016, pet. ref'd) (citing *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)). "If error is found, we then analyze that error for harm." *Id.* (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)).

Where, as here, there was no objection to the trial court's charge, "a reversal will be granted only if the charge error causes egregious harm, meaning the appellant did not receive a fair and impartial trial." *Id.* "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* (citing *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007); *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006)). "[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* (citing *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995)). "To obtain a reversal for jury-charge error, an appellant must have suffered actual harm, not merely theoretical harm." *Id.* at 274 (citing *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012)).

### B. A Multiple-Assailant Instruction Was Required

"A person is justified in using deadly force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary. . . to protect the actor against the other's use or attempted use of unlawful deadly force," if the actor's actions would be justified under Section 9.31 of the Texas Penal Code. TEX. PENAL CODE ANN. § 9.32(a) (West 2011). Also, "the Court of Criminal Appeals has held that a defendant is entitled to a charge on the right to defend against multiple assailants if there is evidence, no matter how weak or contradicted, the defendant believed himself to be in danger of attack from more than one person." *Mata v. State*, 939 S.W.2d 719, 722 (Tex. App.—Waco 1997, no pet.) (citing *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985)). "Restricting the charge to the right of self defense against only the [victim] is error if there is evidence that more than one person assailed the defendant." *Id.* (citing *Frank*, 688 S.W.2d at 868; *Sanders v. State*, 632 S.W.2d 346, 347–48 (Tex. Crim. App. [Panel Op.] 1982)).

Because there was evidence to support an instruction to the jury regarding Hodges' right to defend himself against multiple assailants, it was error for the trial court to limit its instructions to Hodges' right to defend himself against only the victim on each count. *See id.*

### C. Egregious Harm Is Not Shown

We now address whether Hodges was egregiously harmed by the omission of the multiple-assailant instruction. In doing so, we are guided by the Waco court's opinion in *Mata*.

Mata was convicted of the voluntary manslaughter of Rutilio Rivera. *Id.* at 721. Rivera's death occurred after an altercation between Mata, Rivera, and two of Rivera's friends, Raymond

Salazar and Julio Lazoya. *Id.* The State's witnesses testified that Mata stabbed Rivera during an argument and that Rivera, Salazar, and Lazoya then grabbed Mata in an attempt to disarm him. *Id.* Arguing self-defense, Mata claimed that Rivera, Salazar, and Lazoya attacked him, wrestled him to the ground, and beat him until Mata stabbed his attackers. *Id.* The trial court submitted an instruction on self-defense, which the jury rejected, but erred in submitting an instruction that Mata was entitled to defend himself against multiple assailants. *Id.* at 722.

In addressing egregious harm, the Waco Court of Appeals noticed that the trial court instructed the jury that it was their duty to consider all of the facts and circumstances in evidence in considering whether the defendant acted in self-defense, an instruction which the jury was presumed to follow. *Id.* at 723. The court also noted that the State discussed the presence of multiple assailants during trial and that the defense expended much of its time for closing argument on "the issue of self[-]defense as it related to Mata's perception of the situation based on his quarrelsome history with" the multiple assailants. *Id.* Reasoning that it could "find nothing in the record to indicate that the jury only considered the acts of Rivera without also considering the presence and actions of Salazar and Lazoya," the Waco Court of Appeals determined that Mata failed to demonstrate egregious harm from the omission of a multiple-assailant instruction. *Id.*

Similarly, as demonstrated above, the jury was asked to determine whether Hodges reasonably believed that deadly force was immediately necessary to protect himself against the victim's attack. During trial, the jury heard evidence of multiple assailants, the State discussed the defense's theory that Hodges was defending himself from attack by multiple assailants, and Hodges' closing argument also discussed the multiple-assailant theory. The trial court's charge

11

defined the term "reasonable belief" as "a belief that would be held by an ordinary and prudent person in the same circumstances as Defendant" and also explained that the jury was to consider "all the facts and circumstances in evidence" and all relevant facts and circumstances surrounding the offenses in determining the existence of real or apparent danger. The trial court further instructed the jury, "[In considering the circumstances,] you should place yourselves in the Defendant's position at that time and view them from his standpoint alone." As in *Mata*, the jury here was instructed to consider the acts of multiple assailants in determining whether Hodges' actions were justified in using force against the victim. Thus, guided by *Mata*, we must conclude that Hodges has failed to demonstrate egregious harm from the omission of the instruction.

There is also an additional circumstance present here, which was not in consideration in *Mata.* Hodges' defensive theory relied on Cashaw, Scott, or both of them together as being the aggressors. The jury had the opportunity to consider Scott as the aggressor in Count I and Cashaw as the aggressor in Count II, but rejected self-defense on both counts. The jury's rejection of self-defense on both counts demonstrated that it considered neither Scott nor Cashaw to be the aggressors. Thus, it is highly unlikely that the multiple-assailant instruction would have had any effect in the jury's verdict had it been given. Simply put, Hodges cannot demonstrate actual, as opposed to theoretical, harm from the trial court's omission of the multiple-assailant instruction.

We overrule Hodges' sole point of error.

12

## III. Conclusion

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     November 28, 2016
Date Decided:       December 21, 2016

Do Not Publish